UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE LINK, o/b/o A.L., a minor,[1]

                  Plaintiff,            Civil Action No. 12-12644
                                      Honorable Mark A. Goldsmith
                                      Magistrate Judge David R. Grand

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                  Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 11]

Plaintiff Michelle Link ("Plaintiff") brings this action on behalf of her minor son, A.L., pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying A.L.'s application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [8, 11], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). [2].

I.     **RECOMMENDATION**

For the reasons set forth below, the court finds that the Administrative Law Judge's ("ALJ") conclusion that A.L. is not disabled under the Act is not supported by substantial evidence. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [11] be DENIED, Plaintiff's Motion for Summary Judgment [8] be GRANTED, and

---

[1] Though the complaint lists A.L. as the plaintiff in this action, the captions on the parties' subsequent briefing identify his mother as the plaintiff on his behalf. [8, 11]. For the sake of clarity, the court adopts the latter convention here.

that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be REMANDED for further proceedings consistent with this Report and Recommendation.

## II.    REPORT

### A.    Procedural History

On April 20, 2009, an application for SSI was filed on behalf of A.L., alleging a disability onset date of September 1, 2002.  (Tr. 140).  This application was denied initially on July 28, 2009.  (Tr. 57-62).  A timely request for an administrative hearing was filed on A.L.'s behalf, and a hearing was held on October 29, 2010, before ALJ Christopher T. Skarda.  (Tr. 31-56).  A.L., who was represented by attorney Mikel Lupisella, testified at the hearing, as did Plaintiff.  On November 23, 2010, the ALJ issued a written decision finding that A.L. is not disabled.  (Tr. 10-30).  On May 8, 2012, the Appeals Council denied review.  (Tr. 1-6).  Plaintiff filed for judicial review of the final decision on June 18, 2012.  [1].

### B.    Background

#### 1.    Disability Reports

Plaintiff completed a disability report regarding A.L.'s condition in the spring of 2009, in which she reported that A.L. suffers from ADHD and bipolar disorder and "[h]as had issues since age 6."  (Tr. 145).  According to Plaintiff, A.L. "has emotional outburst[s] including yelling" and "crying," he "hits himself" and "bangs his head on [and with] objects" and "[h]its other objects . . . when angry," he "[w]ill be fine one minute [and] the next very emotional," and he "[h]as anxiety issues" and "freaks out if things do not go a certain way."  (Id.).  Plaintiff reported that "[t]his has caused issues at school" such as "wetting his pants because he is afraid to be late to class," that A.L. "[h]as trouble focusing" and "finishing task[s] he started," that he "[i]s now below average . . . in some classes due to not finishing/missing assignments" and

"[d]oes not organize well [and] loses things needed for class," and that he "[i]s currently being evaluated for an IEP/504 plan." (*Id.*). Plaintiff also reported that A.L. has "sleep issues." (*Id.*). Plaintiff reported that A.L. has been seeing Dr. Roderick Smith at Hurley Mental Health Associates once a month for eight years in connection with his conditions, which Dr. Smith diagnosed and has been treating with medication. (Tr. 146, 148-50; *also* Tr. 168-69). She also reported that A.L. has been seeing David Rahn at Hurley Mental Health Associates for therapy and evaluations on a monthly basis since the fall of 2008. (Tr. 146, 148).

In a daily activities report dated May 23, 2009, Plaintiff reported that A.L. enjoys watching television, playing video games, listening to music, drawing, and playing youth baseball (but no longer plays football or indoor soccer). (Tr. 155). He also participates in school plays. (Tr. 155-56). She reported A.L. has two neighborhood friends with whom he plays sometimes, but often has difficulty when trying to play with more than one friend at a time. (Tr. 155). She also reported that A.L. argues, yells, cries, and hits himself and other things when asked to do things such as chores. (*Id.*). He requires a lot of supervision and direction when doing chores and caring for his personal needs. (Tr. 156). She described A.L.'s problems at school as "mostly organizational skills [and] some emotion[al] meltdowns," and noted in particular that he either fails to do or forgets to turn in assignments and that, when asked about them, "[h]e cries [and] has . . . a meltdown." (Tr. 155). She also reported that A.L. misses a lot of school due to illness or because "he gets sick (vomits) at school" and "has to come home because of school policy." (Tr. 156). She noted that A.L. "is a wonderful boy" and "tries hard," but "is easily frustrated" and "gets angry or moody quickly," and "at school he is very smart but unorganized which caused his declining grades." (Tr. 158).

3

2.      *The October 29, 2010 Hearing Before the ALJ*

a.      *A.L.'s Testimony*

At the hearing before the ALJ, A.L. testified that he is fourteen years old, is in ninth grade, and lives with his mother and grandparents.  (Tr. 34-36).  He has a friend in the neighborhood that he has known for a long time and with whom he occasionally plays video games.  (Tr. 35-36).  He testified that he is not in special education classes at school, but does have an Individualized Education Program (IEP) and is able to move to a different room to take tests and do work; his school has a learning and study skills center that he went to in eighth grade, and while he was told to do the same in ninth grade, he testified that he "never got a class for that."  (Tr. 36-38).  He testified that he had one physical altercation with another student in eighth grade, but has not had any disciplinary problems in ninth grade.  (Tr. 38).  He testified that he is "in class as much as I need to be" but has not been turning in all his assignments and sometimes forgets what homework he has.  (Tr. 40-41).  He testified that he takes medication to help him focus and sleep.  (Tr. 41-42).  He testified that he is able to take care of his personal grooming himself but has to be reminded to do so most of the time, and that he is responsible for doing household chores on the weekends such as vacuuming and dusting.  (Tr. 42-43).

b.      *Plaintiff's Testimony*

Plaintiff also testified at the hearing before the ALJ, and confirmed that, aside from the altercation in eighth grade, A.L. has not had any significant disciplinary problems in middle or high school.  (Tr. 43-44, 46).  As to issues she sees on a daily basis with A.L., Plaintiff testified that A.L. "has a meltdown" "when he doesn't get to do the things he thinks he should be able to do"; these meltdowns include hitting himself and crying, but he has never injured himself such that he had to go to the emergency room.  (Tr. 44-45).  During these episodes, A.L. sometimes

4

says things like "maybe you'd be happier if I was gone," but he has never acted on them or had any suicide attempts. (Tr. 46-47). Plaintiff testified that she has been checking his homework since middle school and that A.L. has an IEP at school; in middle school, this IEP comprised a skills studies class, but Plaintiff testified that she is still trying to figure out how the IEP works in the high-school setting. (Tr. 46-47). She confirmed that A.L. has never moved from the general education environment, but receives accommodations and modifications. (Tr. 47). She testified that A.L. usually takes his medications, but does not like to take one of them because he does not think it does anything for him. (Tr. 47-48). She testified that A.L. is interested in performing and participates in school plays, and that he is "actually very good at his school work" but they "battle over" "getting him to complete it." (Tr. 48-49, 52). She testified that A.L. has difficulty sleeping, getting up multiple times a night and also singing, talking, and laughing in his sleep. (Tr. 54-55). She also testified that A.L. had some difficulties with wetting his pants in middle school, but to her knowledge, has not had them in high school; he still has accidents at night, but takes care of cleaning them up himself. (Tr. 53-54). She testified that she has to remind A.L. every day to perform self-grooming tasks and to do his chores, but that A.L. is "very polite in public," has a good sense of humor and a good memory, and is "basically a good kid." (Tr. 51-55).

### 3.    Medical Evidence

#### a.    Treating Sources

##### 1.    Dr. Roderick Smith

According to Plaintiff, A.L. began seeing psychiatrist Roderick Smith, M.D., in September of 2001, and has been seeing him on a monthly basis since. (Tr. 146). Plaintiff reports that Dr. Smith diagnosed A.L. with ADHD when A.L. was six years old, and at some point thereafter diagnosed him with bipolar disorder as well. (*Id.*). The record contains

5

treatment notes from Dr. Smith dating between February 2005 and March 2010. (Tr. 186-203, 256-265, 284-92, 305-12). These notes reflect that, throughout this time, A.L. saw Dr. Smith every one to two months, sometimes with Plaintiff, and that Dr. Smith treated A.L.'s conditions with medication. Dr. Smith's notes from February 2005 through January 2007 generally indicate that A.L. was doing well in school and with his treatment plan, though they also periodically report irritability, argumentativeness, forgetfulness, mood swings, and difficulty sleeping. (Tr. 186-203). In a September 2005 note, Dr. Smith indicated that A.L. was "in school regularly" and "participating in football nightly and on the weekends," but "does not pay attention very well" and is "fidgety and restless." (Tr. 198). In a January 2007 note, Dr. Smith observed that A.L. "is a smart young lad and I don't see any isolated learning disorders," but he "has organizational issues and despite being on the current regimen, an IEP may be helpful for him to work on organizational issues." (Tr. 186).

Dr. Smith's next treatment note of record is from March 2008, in which he noted that A.L. "[s]eems to be doing pretty well" and "[s]eems to be controlling his mood pretty well," was receiving "B's and C's" in school, and "is not playing any sports." (Tr. 265). In May 2008, Dr. Smith noted A.L. was "doing fairly well" and playing baseball, but was sometimes forgetful of his homework, causing his grades to drop. (Tr. 264). In October 2008, Dr. Smith noted that A.L. "[s]ometimes is not trying his best in school," "has forgotten to turn in some assignments which have led to his grades declining in a couple of subjects," and "was taken off the football team because he wasn't getting his homework turned in," but was motivated to do better so that he could be on the basketball team. (Tr. 261). In December 2008, Dr. Smith noted problems with missing assignments in English and Science and a consequent drop in grades (namely, an E in English), describing it as "mainly a disorganization situation." (Tr. 259). In February 2009,

6

Dr. Smith noted that A.L. was "having some problems in the a.m. with inattentiveness and distractibility causing him problems in one of his favorite subjects, mathematics," and that "[h]e's gotten two E's on his report card" which "is unusual for him as he's an honors student"; Dr. Smith changed some of A.L.'s medication "[b]ased on the inattentiveness and the lack of performance." (Tr. 257).

In March 2009, Dr. Smith noted A.L. was "[n]ot seeming focused as well as he needs to" in spite of a change in his medication, was having "some problems with mood lability and agitation," was "antsy, fidgety, inattentive, distracted," and was "hav[ing] some academic underachievement." (Tr. 256). In May 2009, Dr. Smith noted that A.L. was "[d]oing fairly well" though "[h]is mood is a bit labile at times and he is argumentative" and "is also impulsive and inattentive later in the day." (Tr. 309). He also noted that A.L.'s "grades dipped this year" as "[h]e was formerly an A student and he dipped into the B/C range," that "[h]e's easily satisfied with the grades he's getting at this point and just wants to make sure that he doesn't fail," and that "[h]e has a 504 Plan now to help him with organizational skills." (*Id.*). In August 2009, Dr. Smith noted that A.L. was benefiting from his current medication but was having some problems with "concentration," "impulsivity," "mood lability," and "modulating anger and irritability and agitation"; he also noted that A.L. was "[a]lert" and "pleasant" during the session, but at times "inattentive" and "easily seems to drift off task." (Tr. 311). He noted that A.L. was trying to decide whether to play football and that he enjoyed being involved in theater at school, but that "[d]uring the time that he was involved in acting, he did let his grades slip" and that he was "problems where he gets similarly focused and then may not do as well on coursework." (Tr. 311). Dr. Smith's latest treatment note of record, from March 2010, notes that A.L. was "[d]oing better in school" and his grades, concentration, and focus have improved. (Tr. 288).

On October 25, 2010, Dr. Smith prepared a Childhood Disability Evaluation Form regarding A.L. (Tr. 319-24). He stated that A.L. "has co-existing ADHD and Bipolar Affective Disorder Type II," and described A.L.'s impairments as "[c]linically significant inattentiveness, impulsivity, and moderate – severe mood swings. Not age appropriate in ability to focus, stay on task, work independ [sic]." (Tr. 324, 319). He indicated that A.L.'s impairments met and functionally equaled the listings and noted that "without the necessary psychiatric treatment [A.L.] would have a poor prognosis." (Tr. 319, 324). In particular, Dr. Smith noted that A.L. (1) has marked limitations in acquiring and using information, explaining that he has a "[b]elow age level ability to learn new information and incorporate it into the day with expected problem solving and coping strategies"; (2) has extreme limitations in attending and completing tasks, explaining that A.L. is "[s]everely affected [with] clinical ADHD requiring Focalin at 30-40 mg daily to improve likelihood of completing tasks at all" and experiences "forgetfulness leading to age inappropriate disorderliness, causing great conflict within the home [with] caregivers"; (3) has marked limitations in interacting and relating with others, explaining that A.L. is "[u]nable to get along with same age peers, unable to function as part of a[n] organized sports team," and "[u]nable to complete chores or follow rules within the home"; (4) has marked limitations in caring for himself, explaining that A.L. "[h]as outbursts at times related to completing [activities of daily living], needs excessive reminders compared [with] same age peers," and is "[o]ften very forgetful and unlikely to remember to turn in assignments even though he has completed them"; (5) has marked limitations in health and physical well-being, explaining that A.L. has "[p]oor self esteem, inconsistent academic achievement, has been unable to participate in sports since 9 ½ due to low frustration tolerance, mood swings and distractibility," and his "[p]oor self esteem has complicated [his] cyclic mood episodes"; and (6) has less than marked limitations in

8

moving about and manipulating objects, noting that A.L. "[h]as attentional problems," "may drop hand held items due to impulsivity, inattentiveness [and] distractibility," and has "[p]roblems with rushed penmanship making for barely legible writing and communication." (Tr. 321-22).[2]

### 2.    David Rahn, M.S.W., A.C.S.W.

While A.L. was seeing Dr. Smith, he was also participating in counseling sessions with therapists at Hurley Mental Health Associates; the record contains notes from these sessions dating from 2004 to 2010, and indicates that they occurred once every one to two months. (Tr. 179-85, 204-29, 246-55, 266-69, 280-83, 293-303). A.L. saw a few different therapists from 2004 through 2007, and their notes reflect efforts to help A.L. with his organizational skills, argumentativeness, angry outbursts, impulsive behavior, problem-solving ability, and mood swings. (Tr. 179-85, 204-29). A.L. began seeing David Rahn, M.S.W., A.C.S.W., for these sessions in 2008, and the record contains treatment notes from him through 2010. During this time, Mr. Rahn noted A.L.'s difficulties with concentration, oppositional behavior, emotional swings and outbursts, independent functioning, and sleep, and continued to work with A.L. on these issues and those noted above; in particular, Mr. Rahn encouraged A.L.'s compliance with his prescribed medication and his involvement in activities that he enjoys such as theater, and stressed the importance of setting a structure and limits for A.L. (Tr. 246-55, 266-69, 280-83, 293-303).

On October 26, 2010, Mr. Rahn prepared a Childhood Disability Evaluation Form regarding A.L. (Tr. 314-18). Mr. Rahn noted that A.L. "has been diagnosed as having Bipolar Disorder . . . and ADHD" and "has extreme problems with concentration and managing his

---

[2] As discussed *infra*, these six categories reflect the domains that are evaluated to determine whether a child's impairment(s) functionally equal the medical criteria of a listed impairment.

mood." (Tr. 314). He indicated that A.L.'s impairments functionally equaled the listings. (Tr. 314). In particular, Mr. Rahn noted that A.L. (1) has marked limitations in acquiring and using information, explaining that A.L.'s "ability to acquire and use information is affected by his mood swings, his difficulty concentrating and his oppositional behavior," and that "[h]e can be given information one minute and state that he understands it, then a few minutes later admit that he can't recall any of what had been told him"; (2) has extreme limitations in attending to and completing tasks, explaining that A.L. "is able to track bits of information for short periods of time" but "will then lose his focus on this and move on to something else," that "[d]espite constant monitoring by his mother and consultation with teachers, he is not able . . . to turn in school work consistently" and that "[a]t home he must be reminded and directed to accomplish even the simplest task or series of tasks"; (3) has marked limitations in interacting and relating with others, explaining that A.L. "has difficulty relating and interacting with others for a prolonged period of time," "can be briefly engaging and appealing, but is not able to sustain a relationship," and "can be dramatic and tearful, angry and elated within a span of a few minutes"; (4) has less than marked limitations in caring for himself, noting that A.L. "requires cueing from mother for dress and personal hygiene"; (5) has less than marked limitations in health and physical well-being, explaining that A.L. has "problems with obesity" but "otherwise no apparent health issues"; and (6) has no limitations in moving about and manipulating objects. (Tr. 316-17).

### b.    *Consultative and Non-Examining Sources*

#### 1.    *Dr. Matthew P. Dickson*

On July 14, 2009, psychologist Matthew P. Dickson, Ph.D., examined A.L. and prepared a Childhood Psychiatric/Psychological Medical Report. (Tr. 270-73). A.L. was accompanied to

the appointment by Plaintiff, who reported that A.L. has "been diagnosed with ADHD, bipolar"; is "hyperactive," "moody," "aggressive," and "very disorganized"; "melts down at the drop of a dime" and "doesn't even want to socialize"; had difficulty with "missing assignments" in school and a consequent drop in grades; "smacked himself in the head with his math book when I made him do missing assignments" and "melted down when [his math teacher] asked him about his missing assignments"; and "occasionally has urine accidents in the night" and "has difficulty falling and staying asleep." (Tr. 270). Dr. Dickson noted no reported history of psychiatric hospitalization, and that Dr. Smith was treating A.L. with medication. (*Id.*). He noted that A.L. was entering the eighth grade and was in "regular education" at that time, but that Plaintiff "said he is going to be entering Special Education." (*Id.*). Plaintiff also told Dr. Dickson that A.L. "has problems with personal hygiene," needs to be reminded to do household chores and does "minimal work" on them, and "gets frustrated and leaves peer activities at times." (Tr. 271). Dr. Dickson noted that A.L. "enjoys spending time playing baseball, football, video games and using the computer," and A.L. reported that "he enjoys spending time with others," "gets along well with peers," and "has kept friends for a period of years." (Tr. 271). Dr. Dickson observed that A.L. was oriented with normal thought content and intact memory, and was able to subtract serial sevens and perform simple calculations. (Tr. 271-72). Dr. Dickson diagnosed A.L. with "ADHD, Combined Type" and "Bipolar Disorder NOS," and noted that he possessed a current GAF of 54. (Tr. 272-73). Dr. Dickson indicated that A.L.'s abilities to attend to, acquire, and use information, as well as his ability to complete tasks, are moderately impaired; his abilities to interact and relate to others are moderately impaired; his abilities to move about and manipulate objects and to attend to self-care, as well as his physical well-being, are not impaired; and that overall, A.L.'s "condition would moderately impair his ability to maintain age appropriate

11

behaviors." (Tr. 272).

### 2.    *Dr. Paul Liu*

On July 27, 2009, Paul Liu, D.O., prepared a records-based Childhood Disability

Evaluation Form regarding A.L.'s condition.  (Tr. 274-79).  Dr. Liu identified ADHD and

Bipolar Disorder as A.L.'s impairments, and indicated that these impairments are severe but do

not meet, medically equal, or functionally equal the listings.  (Tr. 274).  Dr. Liu noted that A.L.

(1) has less than marked limitations in acquiring and using information, explaining that his

"[t]eacher and principal note no major restrictions" and he "[e]xceeds standards in reading/math

and met standards in writing skills for 2006 MEAP"; (2) has less than marked limitations in

attending and completing tasks, explaining that his "[t]eacher and principal note no major

restrictions," his "[c]ounselor notes he [is a] bright young boy who struggles with staying

organized," a March 2009 treatment note indicated that he was "antsy, not focused as well as he

usually is even though Vyvanse altered from 50 to 30 mg w/o benefit," and Dr. Dickson noted

"organized thought processes" and "[m]eds helpful"; (3) has less than marked limitations in

interacting and relating with others, explaining that his "[t]eacher and principal note no major

restrictions," his "[p]rincipal notes some behavior issues with anger [management] that

sporadically flares up and child is able to stay under control the majority of the time," an April

2009 treatment note "indicates improved behavior since meds changed," and Dr. Dickson noted

that he "spends time w/ others," "[h]as friends in/out of school," "[g]ets along well w/ peers,"

"[g]ets along OK w/ teachers," and "[h]as reversal of N1 parent-child relationship"; (4) has less

than marked limitations in caring for himself, explaining that his "[t]eacher and principal note no

major restrictions," an April 2009 treatment note indicated that A.L. displayed "[i]mproved

behavior," is "[s]leep[ing] in his own room in his own bed now (wasn't before)," is "[i]nvolve[d]

in a play at school" and "baseball," and his "[a]ffect/mood [is] congruent," and Dr. Dickson

noted that A.L. has "occ[asional] nocturnal enuresis," "[h]as problems staying/falling asleep,"

has "[p]oor academics as not turning in assignments – good performance prior years," is

"[a]ctive in sports," "[n]eeds hygiene reminders," "[d]oes chores with reminders – does minimal

work," and had "[a]dequate grooming and hygiene" and appropriate affect at the examination;

and (5) has no limitations in moving about and manipulating objects and in health and physical

well-being.  (Tr. 276-77).  Dr. Liu further noted that Plaintiff's reports of A.L.'s difficulties to

Dr. Dickson "are only slightly credible" as A.L. "is actually doing OK in school with his

behavior" and "does not have limits on his socialization per school/CE info," though "[h]e does

have some problems noted with organization at school" and "does not complete his homework,

which has impacted his grades."  (Tr. 279).

### 4.    School Records and Evaluations

On April 4, 2007, A.L.'s elementary school principal reported that A.L. "has some

behavioral issues with anger management that sporadically fla[re] up," but "[h]e is able to stay

under control for the majority of the time."  (Tr. 131).  She indicated that A.L.'s reading and

math levels "exceed[ed] standards" and his written language level "met standards," noting that

on an October 2006 MEAP test, A.L. scored a 77% in reading, 67% in math, and 67% in writing.

(Tr. 130).  On an April 15, 2007 Teacher Questionnaire, A.L.'s fifth-grade teacher, Ms.

Wanwormer, stated that "I see absolutely no adverse effects of any disability on day-to-day

school related activities" and reported "no problems observed" with respect to each of the six

domains, though within those domains did note slight problems with providing organized oral

explanations and adequate descriptions, applying problem-solving skills in class discussions,

carrying out multi-step instructions, organizing one's own things or school materials, and

completing class/homework assignments.  (Tr. 132-39).

In May 2009, a counselor from A.L.'s middle school noted that A.L. "is a bright young boy who struggles with staying organized" and reported that A.L. had been referred to Special Education Support for evaluation.  (Tr. 161-62).  On October 22, 2009, A.L. was placed on an Individualized Education Program (IEP).  (Tr. 80).  The IEP report noted that A.L. "was observed to be quiet and somewhat lethargic" in class, that "disorganization was evident," and that A.L. was often absent from or late to class due to somatic complaints.  (Tr. 82).  During interviews, A.L. identified "his lack of organization" as "the major reason he fails his classes" and "reported that he thinks he needs extra help in school with organization."  (Tr. 82-83).  A.L. also "was able to name several friends that he felt were close good friends," identified his strengths as "math, football, and baseball," and "denied a general pervasive mood of unhappiness or depression or physical symptoms or fears," though it was noted that A.L.'s somatic complaints appeared to correlate with his having to return to class.  (Tr. 82-83).

The IEP report noted that A.L.'s frequent somatic complaints reflect a "tendency to develop physical symptoms or fears associated with school or personal problems" and "interfere[] with [his] being able to stay in the classroom and receive instruction and have [the] opportunity to complete classroom assignments."  (Tr. 85).  The report further noted that, as related to his ADHD, A.L. has "poor sustained attention, low organizational skills, and very slow processing speed for written/copying work," and "is not currently able to keep his materials organized, sustain attention while in class, use a planner effectively, and he has a lot of missing assignments, which adversely affects his ability to progress in the general curriculum."  (*Id.*). The IEP report indicated that A.L. would remain in the general education curriculum and would also participate in a secondary level resource program five times per week and social work

14

services one to two times per week.  (Tr. 86-88).

According to a high school report card for the 2009-2010 school year, A.L. received an A in Physical Education, a B in U.S. History, a B- in both Science and English, a C+ in Algebra, and an E in Health; missed assignments were noted in Algebra, and A.L. appears to have missed assignments in other courses as well.  (Tr. 176-77).   For the 2010-2011 school year, A.L. received a C in Health, an A in Physical Education, a B in U.S. History, an A- in Science, a D+ in English, and a C+ in Algebra; missed assignments were noted in English and Algebra, and also appear to have occurred in other courses.  (Tr. 77-79).

### C.    Framework for Child Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The Social Security regulations set forth a sequential three-step process for determining children's disability claims:  first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *See* 20 C.F.R. § 416.924(a).

To "meet" a listed impairment, a child must demonstrate both the "A" and "B" criteria of the impairment.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional

15

limitations which are applicable to children." *Id.* Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the Listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment does not "meet" a listed impairment, the impairment may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. *See* 20 C.F.R. §416.926a. "Medical equivalency is covered by 20 C.F.R. §416.926; functional equivalency is covered by Section 416.926a." *Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003).

"To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, No. 08-254, 2009 WL 1741375, at *8 (S.D. Ohio June 18, 2009) (citing 20 C.F.R. § 416.926(a)). A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;

> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or

> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Evans ex rel. DCB v. Comm'r of Soc. Sec.*, No. 11-11862, 2012 WL 3112415, at *6 (E.D. Mich. Mar. 21, 2012) (quoting *Koepp v. Astrue*, No. 10-1002, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011)); *see also* 20 C.F.R. § 416.926. "The essence of these subsections is that strict

16

conformity with the Listing Requirements is not necessarily required for a finding of disability. If a plaintiff is only able to demonstrate most of the requirements for a Listing or if he or she is able to demonstrate analogous or similar impairments to the impairments of a Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show impairments of equal medical significance." *Evans*, 2012 WL 3112415 at \*7 (quoting *Emeonye v. Astrue*, No. 04-03386, 2008 WL 1990822, at \*4 (N.D. Cal. May 5, 2008)).

Regarding functional equivalence, there are six "domains" that an ALJ considers: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a. Functional equivalence to a listed impairment exists when the child has an "extreme" limitation in one of the six domains or "marked" limitations" in two of the six. *See* 20 C.F.R. § 416.926a(d). An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3)(i). A "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2)(i).

### D.   The ALJ's Findings

Applying this framework, the ALJ determined that A.L. was not disabled under the Act. At step one of his analysis, the ALJ found that A.L. has not engaged in substantial gainful activity since April 20, 2009, the application date. (Tr. 16). At step two, the ALJ found that A.L. has the following severe impairments: bipolar disorder and ADHD. (Tr. 16-18). At step three, the ALJ concluded that these impairments do not meet or medically equal any Listing.

(Tr. 18).  The ALJ also found that A.L.'s impairments do not functionally equal any listing because he has "less than marked" limitations in the domains of "acquiring and using information," "attending and completing tasks," "interacting and relating with others," and "caring for yourself," and no limitations in the domains of "moving about and manipulating objects" and "health and physical well-being."  (Tr. 18-27).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (quotation marks omitted); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499

F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

## F.    Analysis

Although it is difficult to discern Plaintiff's precise argument (e.g., her statement, "Based on the marked limitations in two domains and extreme limitation in one domain." [8 at 9] is not a complete sentence, let alone a cogent argument), she does argue that the ALJ erred by "failing to properly evaluate all the medical records and opinions of evidence."  [8 at 6].  That, coupled with her references to the October 2010 Childhood Disability Evaluation Forms completed by Mr. Rahn and by Dr. Smith, is sufficient (albeit barely) to apprise the court of the nature of her objection to the ALJ's decision.  (*Id.* at 6-10).  Although Plaintiff did a poor job of articulating this objection, that does not detract from the fact that the ALJ erred in failing to properly evaluate Dr. Smith's opinion.  As explained below, and that this error warrants remand.

In determining that A.L.'s impairments did not functionally equal the listings, the ALJ stated that he gave "little weight to the medical opinion of Mr. Rahn" that A.L. "has marked limitations in the areas of acquiring and using information[] and interacting and relating with

19

others as well as extreme limitations in the area of attending and completing tasks."  (Tr. 19).
The ALJ cited two reasons in support:  "Mr. Rahn is not an acceptable medical source and more
importantly, Mr. Rahn's opinion contradicts the medical records as well as testimony of both"
Plaintiff and A.L.  (*Id.*).  He explained,

> [T]here is insufficient evidence to support Mr. Rahn's opinion.  Medical
> records report improvement with medication compliance, which is also
> reflected in [A.L.]'s school reports showing improving grades.  Moreover,
> Mr. Rahn's opinion stands in stark contrast to the opinion of [A.L.]'s
> middle school teacher, Ms. Wanwormer, who stated, "I see absolutely no
> adverse effects of any disability on day-to-day school related activities."
> Exhibit 2E. . . . [A]s [A.L.]'s middle school teacher, Ms. Wanwormer in
> a better position to understand the severity of [A.L.]'s limitations as she
> has a longitudinal perspective due to spending over 6 hours a day with
> [A.L.] for 9 months out of the year.

(*Id.*).  The ALJ then noted that he gave "weight to the medical opinions of Dr. Dickson . . . and
Paul Liu, D.O.," as those opinions "consider [A.L.]'s subjective allegations as well as the school
records."  (*Id.*).

However, in this discussion of the opinion evidence, the ALJ made no mention of Dr.
Smith or his October 2010 report, in which he opined that A.L. was extremely limited in the
domain of "attending and completing tasks," and markedly limited in the domains of "acquiring
and using information," "interacting and relating with others," "caring for yourself," and "health
and physical well-being."  (Tr. 319-24).  Nor was the report mentioned elsewhere in the ALJ's
decision, though Dr. Smith was mentioned.  At step two of the analysis, the ALJ noted that A.L.
"attended therapy sessions with" Dr. Smith, and summarized certain of his treatment notes.  (Tr.
17).  The ALJ then referred to one such note in his step-three analysis of the "acquiring and
using information" domain, explaining that while A.L.'s grades declined in ninth grade, "Dr.
Smith noted the issue was largely a 'disorganization' issue and not one of intellectual
functioning."  (Tr. 21; *see* Tr. 259).  The ALJ also generally referenced "treatment notes" at

various other points in his step-three analysis, but did not specify their source.

Plaintiff does not raise any objection to the ALJ's treatment of Mr. Rahn's or Dr. Smith's opinions other than a general assertion of the treating physician rule. [8 at 9-10]. The treating physician rule "mandate[s] that the ALJ 'will' give a treating source's opinion controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)). "If the ALJ declines to give a treating source's opinion controlling weight, [the ALJ] must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see, e.g.*, *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Even when inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.").

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given to a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(c)(2)). Those reasons "must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id.* (quoting S.S.R. 96-2p). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights" and "'to

21

let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that []he is not.'" *Id*. at 937-38 (quoting *Wilson*, 378 F.3d at 544). The requirement also "safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the [treating physician] rule.'" *Id*. at 938 (quoting *Wilson*, 378 F.3d at 544).

Plaintiff's reliance upon this rule with respect to Mr. Rahn's opinion is misplaced. As the ALJ noted, licensed social workers such as Mr. Rahn are not "acceptable medical sources" whose opinions may be entitled to controlling weight under 20 C.F.R. § 416.927(c)(2). *See* 20 C.F.R. § 416.913(a); S.S.R. 06-03p; *Holcomb v. Astrue*, 389 F. App'x 757, 759 & n.2 (10th Cir. 2010) ("Licensed clinical social workers are considered 'other sources,' as defined in 20 C.F.R. § 404.1513(d) and 416.913(d)" and "they cannot, by themselves, establish a medically determinable impairment, constitute a medical opinion, or be considered the opinions of a treating source."). Instead, when considering opinions of "other sources" such as Mr. Rahn, the ALJ "generally should explain the weight given to [them] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." S.S.R. 06-03p. As set forth above, the ALJ clearly identified the weight he afforded Mr. Rahn's opinion and the reasons why; Plaintiff offers, and the court finds, nothing to indicate that the ALJ's analysis of this opinion fell short of the applicable standard.

Dr. Smith, however, as a licensed psychiatrist who treated A.L. regularly during the relevant time period, is an "acceptable medical source" to whom the treating physician rule applies. As such, Dr. Smith's opinion as expressed in his October 2010 report was entitled to

controlling weight unless the ALJ determined that it was "inconsistent with the other substantial

evidence in [A.L.]'s case record" or not "well-supported by medically acceptable clinical and

laboratory diagnostic techniques," in which case the ALJ must then assign the opinion a weight

and provide "good reasons" in support.  *Cole*, 661 F.3d at 937.  The ALJ's decision, however,

provides no indication that he considered or was even aware of Dr. Smith's report, let alone that

he evaluated the weight to which it was entitled.

The Commissioner does not dispute that the ALJ erred in this regard, but argues that such

error was harmless.  The Sixth Circuit has recognized that the treating physician rule "is not a

procrustean bed, requiring an arbitrary conformity at all times," *Friend*, 375 F. App'x at 551, and

its violation

> can be deemed to be "harmless error" if "(1) a treating source's opinion is
> so patently deficient that the Commissioner could not possibly credit it;
> (2) if the Commissioner adopts the opinion of the treating source or makes
> findings consistent with the opinion; or (3) where the Commissioner has
> met the goal of [20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2)] . . . even
> though she has not complied with the terms of the regulation."

*Cole*, 661 F.3d at 940 (quoting *Friend*, 375 F. App'x at 551).[3]

According to the Commissioner [11 at 8], the ALJ's failure to discuss Dr. Smith's

opinion was harmless error because Dr. Smith's opinion was "so patently deficient that the

Commissioner could not possibly credit it."  *Id.*  The court disagrees.  Dr. Smith had treated A.L.

---

[3] As to the third category, the court in *Friend* elaborated,

> [T]he procedural protections at the heart of the rule may be met when the
> "supportability" of a doctor's opinion, or its consistency with other evidence in
> the record, is *indirectly* attacked via an ALJ's analysis of a physician's other
> opinions or his analysis of the claimant's ailments. . . . If the ALJ's opinion
> permits the claimant and a reviewing court a clear understanding of the reasons
> for the weight given a treating physician's opinion, strict compliance with the rule
> may sometimes be excused.

375 F. App'x at 551 (internal quotation marks omitted).

regularly over many years.  (*See* Tr. 146, 186-203, 256-265, 284-92, 305-312).  He completed

the report in full and provided explanations for each limitation indicated.  The ALJ might agree

with the Commissioner that these explanations are deficient, but the court does not find them

"patently" so, such that the ALJ need not articulate that finding, the resultant weight afforded to

the opinion, and the "good reasons" in support.  *See, e.g.*, *Grainger v. Comm'r of Soc. Sec.*, No.

12-296, 2013 WL 1303826, at *15 (N.D. Ohio Mar. 28, 2013) (rejecting argument that treating

source's reports were "patently deficient" because "[a]lthough Defendant asserts they deserved a

lesser weight, they were not so patently contrary to legal standards of treating source evidence

that they should have been disregarded in their entirety," in contrast to a case where "the treating

physician's assessment consisted of a single note authored by the doctor on a prescription pad,

unsupported by objective medical findings or reports").

Nor does the court find that this error can be excused because, as the Commissioner

argues, "the ALJ's rationale for discounting Mr. Rahn's opinion could be similarly applied to Dr.

Smith's opinion" and "Dr. Smith's opinion was inconsistent with the evidence of record, and

thus, not entitled to any weight."  [11 at 9].  First, under the circumstances of this case, the court

declines to find that "the goal of [20 C.F.R. § 416.927(c)(2)]" can be met by simply assuming

that the weight and reasoning applied to Mr. Rahn's opinion would apply equally to Dr. Smith's

opinion.  *Cole*, 661 F.3d at 940.  Dr. Smith treated A.L. regularly for over eight years, and he is

the only medical source of record whose opinion regarding A.L.'s impairments is entitled to

review under the deferential standard of the treating physician rule; correspondingly, the ALJ's

assessment of Mr. Rahn's opinion was expressly informed, in part, by the fact that he was not an

"acceptable medical source" and thus his opinion was not subject to that rule.  The court also

notes that the April 2007 report from A.L.'s fifth-grade teacher (in which the ALJ seemed to put

24

much stock) pre-dated Dr. Smith's October 2010 report by 3½ years.  Finally, there was at least some evidence that A.L.'s school performance materially worsened during much of that intervening period, and he was given an IEP in the fall of 2009.  (*See* Tr. 80-89, 176-77, 256-65, 309-12; *cf.* Tr. 288-89 (showing some improvement in performance in March 2010)).  Accordingly, the court cannot guess—and, under § 416.927(c)(2), should not have to guess—how the ALJ, upon application of the treating physician rule, would weigh Dr. Smith's opinion, and how that weight would in turn affect his assessment of the other evidence of record, including the opinions of Mr. Rahn, Dr. Liu, and Dr. Dickson.

Similarly, it may be that the ALJ, upon consideration of Dr. Smith's report, would share the Commissioner's reasoning that its findings are inconsistent with the evidence of record; the court declines, however, to make such an assumption here, particularly since the ALJ provides no indication that he even considered Dr. Smith's report and elsewhere seems to treat Dr. Smith as a credible source regarding A.L.'s conditions.  *See, e.g.*, *Kemp v. Comm'r of Soc. Sec.*, No. 11-14224, 2013 WL 1286158, at *6 (E.D. Mich. Mar. 28, 2013) ("The ALJ failed to articulate why he did or did not consider [the treating physician]'s opinion.  Because no reasoning is available, 'the ALJ's failure to follow the [Commissioner's] procedural rule does not qualify as harmless error where we cannot engage in "meaningful review" of the ALJ's decision.'" (quoting *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 409 (6th Cir. 2009))); *Grainger*, 2013 WL 1303826 at *15 (remand was warranted where it was "impossible for the Court to say whether [the ALJ] considered [the treating physician]'s assessments in any way" and "[t]he Court [was] unable to determine what weight the ALJ afforded to [these] opinions, if any, and under what justifications"); *Crismore v. Astrue*, 669 F. Supp. 2d 1194, 1197-98 (D. Mont. 2009) (finding error not harmless and ordering remand when ALJ provided no indication that he

assessed or evaluated treating physician's most recent opinion regarding claimant's condition and accepted earlier opinions of that physician); *see also Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 754 (6th Cir. 2011) ("The harmless-error doctrine cannot be stretched far enough to excuse the ALJ's failure to meaningfully indicate, even indirectly, how much weight he accorded the two treating sources . . . vis-a-vis each other, vis-a-vis the numerous non-treating sources, and *why*.  It is not this Court's role, or even the district court's role, to scour the record for evidence and expert reasoning which the ALJ *might* have relied on and which *could* support a finding of no-disability *if* the ALJ actually considered it.").[4]

In sum, the ALJ's decision has not left this court—or more importantly, Plaintiff and A.L.—with a sufficiently "clear understanding" of whether the ALJ weighed Dr. Smith's October 2010 report in his analysis and, if so, what weight he afforded it and why.  *Friend*, 375 F. App'x at 551.  Accordingly, this court cannot conclude that the ALJ's error was harmless, and must instead recommend remanding the matter to the ALJ for proper application of the treating physician rule to Dr. Smith's opinion.  *See id.* (an ALJ's "failure to follow the procedural

---

[4] *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir. 2007), on which the Commissioner relies, does not compel a contrary conclusion.  [11 at 7].  In that case, the Sixth Circuit remanded the matter to the ALJ because he had failed to properly apply the treating physician rule.  Nothing in that decision compels a finding that the ALJ's error here was harmless.  To the contrary, the Sixth Circuit's conclusion seems apropos of the error made here by the ALJ:

> [T]he standards applied by the ALJ prevent this court from finding that the Commissioner's decision is supported by substantial evidence.  These standards, although quite deferential to the findings of the Commissioner, do have certain limitations.  Chief among them is the requirement that all determinations be made based upon the record in its entirety.  This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history, if that one aspect does not reasonably portray the reality of the claimant's circumstances.

*Id.* at 249 (citation omitted).

requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record'" (quoting *Rogers*, 486 F.3d at 243)); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553-54 (6th Cir. 2011) ("[W]hen an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir. 2009)); *Cole*, 661 F.3d at 940 ("It may be true that, on remand, the Commissioner reaches the same conclusion as to [claimant]'s disability while complying with the treating physician rule and the good reasons requirement; however, [claimant] will then be able to understand the Commissioner's rationale and the procedure through which the decision was reached.  The case must be remanded."); *Wilson*, 378 F.3d at 546 (a reviewing court "cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record of the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely" because this "would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory").

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [11] be DENIED, Plaintiff's Motion for Summary Judgment [8] be GRANTED, and this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: May 20, 2013                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge

## **NOTICE**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 20, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

28